UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| WARREN BROOKS, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-10-0818 |
| | § | |
| AAA COOPER TRANSPORTATION, | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Plaintiff Warren Brooks is a former employee of Defendant AAA Cooper
Transportation ("ACT").  This wrongful termination suit is before the Court on
Defendant's Motion for Summary Judgment [Doc. # 25] to which Plaintiff has
responded [Doc. # 39] and Defendant has replied [Doc. # 41].  Having considered the
full record and applicable legal authorities, the Court **grants** Defendant's Motion for
Summary Judgment.

## I.   BACKGROUND

ACT is a motor carrier and delivery company that employs drivers and other
employees to ship freight.  As such, it is subject to United States Department of
Transportation ("DOT") regulations, which require drug testing as a condition of
employment for certain classifications of employees, including drivers transporting

goods in interstate commerce.[1]   ACT hired Plaintiff on June 19, 2000, as a Dockworker/Linehaul Driver at its Houston terminal.[2]

*The Drug Test.*–   On Friday, February 1, 2008, Plaintiff was selected for a random drug test by ACT's computerized random selection program.[3]  Mike Garza ("ACT's Personnel Manager"), then the Personnel Training Manager at ACT's Houston Terminal, was responsible for administering ACT's drug testing program for employees at the Houston terminal.  ACT's Personnel Manager notified Plaintiff that he had one hour to report for drug testing to NOVA Humble Medical Center ("NOVA"), an independent drug testing collection facility regularly used by ACT.[4] Plaintiff's drug test did not go smoothly.  Cecilia Resendez ("Resendez"), then the Medical Center Administrator at NOVA, called ACT's Personnel Manager several times to relay what was transpiring during that test.  Resendez later provided Michael Garza ("Terminal Manager Garza"), Terminal Manager of the Houston terminal, with a written statement of what transpired during Plaintiff's drug test.

---

[1]     Declaration of Michael Garza ("TM Garza Decl.") [Doc. # 31-2], ¶ 3; Declaration of Mike Garza ("PTM Garza Decl.") [Doc. # 33-2], ¶ 3.

[2]     Oral Videotaped Deposition of Warren Brooks ("Brooks Dep.") [Doc. # 27-1], at 115-17; TM Garza Decl. [Doc. # 31-2], ¶ 4; PTM Garza Decl. [Doc. # 33-2], ¶ 4.

[3]     PTM Garza Decl. [Doc. # 33-2], ¶ 10.

[4]     Brooks Dep. [Doc. # 28-1], at 147, 153-58; PTM Garza Decl. [Doc. # 33-2], ¶ 10; *see also* Declaration of Cecelia Resendez [Doc. # 34-2] ("Resendez Decl."), ¶¶ 3-4; Declaration of Fernando Aguilar [Doc. # 34-3] ("Aguilar Decl."), ¶¶ 2-5.

Although Plaintiff hotly disputes portions of Resendez's account of what happened during the drug test on February 1, 2008, he admits that he has no personal knowledge of what Resendez reported to ACT.[5]  It is undisputed that NOVA reported to ACT orally and in writing the following information regarding Plaintiff's drug test.

In Resendez's first telephone call to ACT's Personnel Manager, she reported that Plaintiff's first urine sample had a foreign substance floating in it, which made it invalid for DOT drug testing purposes.[6]  Resendez informed Plaintiff that his first sample was invalid, and that he would need to provide a second sample, observed by a male Specimen Collector in order to ensure accuracy and to ensure against any tampering with the sample.[7]  Plaintiff provided a second sample that was not observed.[8]  Accordingly, as mandated by federal regulations, Resendez told Plaintiff that under the circumstances she would not be able to accept the second sample

---

[5]     Brooks Dep. [Doc. #28-1], at 169-70 (indicating he had no personal knowledge of any call between NOVA and ACT); *id.* at 172-73 (indicating he had not previously seen Resendez's written report to ACT).

[6]     TM Garza Decl. [Doc. # 31-2], ¶ 11, PTM Garza Decl. [Doc. # 33-2], ¶ 11, Resendez Decl., ¶¶ 5-6; Aguilar Decl., ¶¶ 6-7.

[7]     TM Garza Decl. [Doc. # 31-2], ¶ 12; PTM Garza Decl. [Doc. # 33-2], ¶ 12; Resendez Decl., ¶ 7, Aguilar Decl., ¶ 8.

[8]     Resendez reported that as she was walking away to locate a male observer for Plaintiff's second sample, Plaintiff grabbed a specimen cup and went into the restroom alone.  Resendez further reported that Plaintiff emerged from the restroom offering an unobserved second urine sample. TM Garza Decl. [Doc. # 31-2], ¶ 12; PTM Garza Decl. [Doc. # 33-2], ¶ 12; Resendez Decl., ¶ 8, Aguilar Decl., ¶ 9.

because it had not been observed, and that she would try to get another observed urine sample from Plaintiff.[9]

Resendez called ACT's Personnel Manager again a few minutes later.  She informed him that while she had been on the phone in her office, Plaintiff had said to Fernando Aguilar ("Aguilar"), a Specimen Collector at NOVA, "I have a family, please do it for me, because I smoked pot and I will not pass," and that Aguilar had informed Plaintiff that he could not assist him.[10]  Although Plaintiff disputes that he made such a statement,[11] he admits he has no personal knowledge of what Resendez reported to ACT.[12]

Resendez called ACT's Personnel Manager a third time and reported that she told Plaintiff again that he would need to provide a new observed urine sample; that Plaintiff indicated to her that he could not urinate again so she instructed him to sit in the waiting room and drink water;[13] and that Plaintiff did not drink water as instructed

---

[9]   TM Garza Decl. [Doc. # 31-2], ¶ 12; PTM Garza Decl. [Doc. # 33-2], ¶¶ 12, 13; Resendez Decl., ¶ 8; Aguilar Decl., ¶ 9.

[10]   TM Garza Decl. [Doc. # 31-2], ¶ 13; PTM Garza Decl. [Doc. # 33-2], ¶ 14; Resendez Decl., ¶¶ 11-12; Aguilar Decl., ¶¶ 10-11.

[11]   *See* Brooks Dep. [Doc. # 28-1], at 184.

[12]   *Id.* at 167-70 (indicating he was not party to any communication between NOVA and ACT).

[13]   TM Garza Decl. [Doc. # 31-2], ¶ 13; PTM Garza Decl. [Doc. # 33-2], ¶ 15; Resendez Decl., ¶ 13; Aguilar Decl., ¶ 12.  Federal DOT regulations provide that if an employee
(continued...)

and kept falling asleep.[14]  Resendez also informed ACT's Personnel Manager that it was nearing 6 p.m., when NOVA closed for the day.  She indicated that NOVA could have someone stay after-hours to attempt to get an observed sample from Plaintiff but that it would cost an additional fee of $175 per hour.[15]  After speaking with Terminal Manager Garza, who approved the additional cost,[16] ACT's Personnel Manager informed Resendez that someone at NOVA should stay late with Plaintiff to attempt to get an observed sample.[17]

Resendez later made a fourth telephone call to ACT's Personnel Manager. ACT's Personnel Manager put Resendez on speaker phone because Terminal Manager

---

[13](...continued)
is unable to provide a valid urine sample due to such employee's apparent tampering with the specimen, another sample must be taken immediately, and he or she should be urged to drink water and wait at the testing facility for "a period of up to three hours or until the individual has provided a sufficient specimen." PTM Garza Decl. [Doc. # 33-2], ¶ 15.

[14]     Resendez reported that she kept having to wake Plaintiff up and ask him to drink water so that he could provide NOVA with another urine sample.  TM Garza Decl. [Doc. # 31-2], ¶ 13; PTM Garza Decl. [Doc. # 33-2], ¶ 15; Resendez Decl., ¶ 13; Aguilar Decl., ¶ 12.

[15]     TM Garza Decl. [Doc. # 31-2], ¶ 14; PTM Garza Decl. [Doc. # 33-2], ¶ 16; Resendez Decl., ¶ 14.

[16]     At this time, ACT's Personnel Manager relayed to Terminal Manager Garza the substance of all of Resendez's calls up to that point.  TM Garza Decl. [Doc. # 31-2], ¶¶ 11-14.

[17]     PTM Garza Decl. [Doc. # 33-2], ¶¶ 16-18.

Garza was also in the office.[18]  Resendez reported at that time that it had been almost

three hours since Plaintiff was first asked to provide a urine sample for his drug test,

and that per DOT drug testing regulations, a person was to be given three hours to

provide a valid specimen for the test.[19]  Terminal Manager Garza told Resendez that

she should let Plaintiff leave at the three hour mark.[20]

Resendez called ACT's Personnel Manager a fifth time.  Again, he put the call

on his speaker phone so Terminal Manager Garza could hear the conversation.[21]

Resendez reported that NOVA could take a blood sample from Plaintiff.  She reported

that a blood sample would be valid in court although it was not recognized as a valid

testing method under DOT regulations.[22]  ACT's Personnel Manager told Resendez

that ACT did not want NOVA to take a blood sample, as he did not want to use testing

methods not recognized by the DOT.[23]  Resendez reported she would let Plaintiff

---

[18]     TM Garza Decl. [Doc. # 31-2], ¶ 15; PTM Garza Decl. [Doc. # 33-2], ¶ 19; Resendez
Decl., ¶ 16.

[19]     TM Garza Decl. [Doc. # 31-2], ¶ 15; PTM Garza Decl. [Doc. # 33-2], ¶ 19; Resendez
Decl., ¶ 16.

[20]     TM Garza Decl. [Doc. # 31-2], ¶ 15; PTM Garza Decl. [Doc. # 33-2], ¶ 19; Resendez
Decl., ¶ 16.

[21]     TM Garza Decl. [Doc. # 31-2], ¶ 16.

[22]     TM Garza Decl. [Doc. # 31-2], ¶ 16; PTM Garza Decl. [Doc. # 33-2], ¶ 20; Resendez
Decl., ¶ 17.

[23]     TM Garza Decl. [Doc. # 31-2], ¶ 16, PTM Garza Decl. [Doc. # 33-2], ¶ 20, Resendez
Decl., ¶ 17.

leave because the three hour time limit was expiring.[24]

*The Investigation.*–  On Monday, February 4, 2008, Terminal Manager Garza called Resendez and requested a written explanation of what had occurred during Plaintiff's February 1, 2008, drug test.[25]  Later that same day, Terminal Manager Garza called Plaintiff into his office to discuss the test.  According to Terminal Manager Garza, Plaintiff told him that NOVA would not accept the first sample because there was something in it, that NOVA requested a second sample, and that Plaintiff provided a second sample.[26]  Terminal Manager Garza told Plaintiff that he needed to investigate further and that Plaintiff should go home.[27]

On Tuesday February 5, 2008, Resendez faxed Terminal Manager Garza her written statement.[28] This written statement contained the previously described account plus additional information about Plaintiff's February 1, 2008, drug test.  Resendez's written statement detailed that Resendez had asked Plaintiff a final time if he could

---

[24]     TM Garza Decl. [Doc. # 31-2], ¶ 16, PTM Garza Decl. [Doc. # 33-2], ¶ 20, Resendez Decl., ¶ 17.

[25]     TM Garza Decl. [Doc. # 31-2], ¶ 18, Resendez Decl., ¶ 22.

[26]     TM Garza Decl. [Doc. # 31-2], ¶ 19.

[27]     *Id.*, ¶ 19.

[28]     TM Garza Decl. [Doc. # 31-2], ¶ 20; Resendez Decl., ¶ 22; Fax dated February 5, 2008, from Cecilia Resendez to Michael Garza ("Resendez's Written Statement"), attached as Exh. G to TM Garza Decl. [Doc. # 33-1], at 3-5.

provide a third urine sample, to which Plaintiff said "yes."[29]   Resendez's written statement further reported that Aguilar told Plaintiff that he would go into the restroom with him and observe him providing a urine sample, at which point Plaintiff became angry and upset and told Aguilar and Resendez that he "couldn't go on his own as it was" and that he was not going to have anybody go into the restroom with him.[30]   Resendez then informed Plaintiff he could leave.  As Plaintiff was leaving, she asked Aguilar to write down Plaintiff's earlier request for Aguilar to "help him." Upon hearing Resendez say this, Plaintiff said "I told him that so I could see what type of a person he was."   Plaintiff then turned away laughing as he left NOVA.[31] Resendez testified that she explained to Plaintiff that although his first urine sample was not valid due to the presence of a foreign substance floating in it, NOVA would be sending the first sample to the lab to be tested.[32]  This sample tested negative for drugs.[33]

---

[29]     TM Garza Decl. [Doc. # 31-2], ¶ 20; Resendez Decl., ¶ 18; Aguilar Decl., ¶ 13; *see also* Resendez's Written Statement, at 2.

[30]     TM Garza Decl., ¶ 20; Resendez Decl., ¶ 18; Aguilar Decl., ¶ 13; *see also* Resendez's Written Statement, at 2.

[31]     TM Garza Decl. [Doc. # 31-2], ¶ 21; Resendez Decl., ¶ 20; Aguilar Decl., ¶ 15; *see also* Resendez's Written Statement, at 2.

[32]     Resendez Decl., ¶ 19.

[33]     Drug Test Result, attached as Exh. 1 to Plaintiff's Evidentiary Appendix [Doc. # 39-2], at 3.

Later on February 5, 2008, Terminal Manager Garza spoke with Plaintiff again about his drug test.  During this conversation, Plaintiff mentioned for the first time that he had informed NOVA that he had a prostate condition that made urinating difficult.[34]  Terminal Manager Garza again asked Plaintiff to give a written statement about what had occurred at the drug test,[35] and to get a written statement from his doctor confirming the prostate condition.[36]  Plaintiff provided a doctor's note later that same day.  The doctor's note stated that Plaintiff had "urinary retention."  The note did not say this condition would make it difficult or impossible for Plaintiff to provide urine samples.  The note also indicated that Plaintiff was taking medication to treat this condition.[37]

Plaintiff's written statement to Terminal Manager Garza provides his version

---

[34]    TM Garza Decl. [Doc. # 31-2], ¶ 22; Brooks Dep. [Doc. # 28-1], at 202-204.  In response, Terminal Manager Garza told Plaintiff that there was a DOT procedure that would have been followed had Plaintiff been unable to provide an adequate sample and had he informed NOVA of the alleged problem.  TM Garza Decl. [Doc. # 32-1], ¶ 22.

[35]    TM Garza Decl. [Doc. # 31-2], ¶ 22.  Plaintiff did provide such a statement.  *See* Letter dated February 5, 2008, from Warren R. Brooks ("Plaintiff's Written Statement"), attached as Exh. H to TM Garza Decl. [Doc. # 33-1], at 7.  Plaintiff claims that Terminal Manager Garza asked for this statement on February 4, 2008.  The date is immaterial and does not create a genuine fact issue which would preclude summary judgment.

[36]    TM Garza Decl. [Doc. # 31-2], ¶ 22.

[37]    TM Garza Decl. [Doc. # 31-2], ¶ 23; *see also* Note dated February 5, 2008, from Terry R. Williams, M.D. ("Doctor's Note"), attached as Exh. I to TM Garza Decl. [Doc. # 33-1], at 9.

of what happened during Plaintiff's February 1, 2008, drug test, an account different from Resendez's.  Specifically, Plaintiff indicated that he told Resendez prior to giving the second sample that he had a prostate problem which made it difficult to urinate and that he was taking medication for this problem.  Plaintiff further stated that after giving the second sample, no one from NOVA said anything to him regarding that sample and that he just sat there drinking water.  Plaintiff indicated that around 6:30 to 6:45 p.m., he still couldn't urinate and he received a call from "John" saying that NOVA was going to accept the first sample, so Plaintiff signed off on the first sample and left NOVA.[38]

Plaintiff does not and cannot dispute, however, what Resendez reported to ACT both verbally and in writing.[39]  Furthermore, to the extent Plaintiff now argues factual inconsistencies concerning what occurred during his drug test,[40] these inconsistencies

---

[38]   *See* Plaintiff's Written Statement, at 1.  Plaintiff's written statement does not indicate who "John" is or what "signing off" on a sample means.

[39]   Brooks Dep. [Doc. #28-1], at 169-70 (indicating he had no personal knowledge of any call between NOVA and ACT); *id.* at 172-73 (indicating he had not previously seen Resendez's written report to ACT).

[40]   Plaintiff now argues in his brief the following regarding his February 1, 2008, drug test:

•   Plaintiff disputes that Resendez told him that Plaintiff's first urine sample would not be accepted because the sample was accepted, sent for testing, and tested negative for drugs.

•   Plaintiff disputes that he was informed both that the second sample would need
(continued...)

are not material given the nature of Plaintiff's legal claims.

Later on February 5, 2008, Terminal Manager Garza went to NOVA to investigate the situation further.  Terminal Manager Garza stated he wanted to ensure that DOT testing procedures had been followed and that there were no misunderstandings between NOVA's staff and Plaintiff.[41]  Resendez told Terminal Manager Garza that Plaintiff had not said anything regarding his prostate condition during the drug test; and that if Plaintiff had mentioned such a condition, it would

---

[40](...continued)

> to be observed and that he simply grabbed a cup as Resendez was walking away.  Plaintiff states now (for the first time) that the second sample was not accepted because it was too small, not because it was unobserved.

- Plaintiff now claims he told Resendez during the drug test that he could not provide a *third* sample due to a prostate problem.  This is inconsistent with Plaintiff's statement to ACT given on February 5, 2008.

- Plaintiff denies that he said to Aguilar "I have a family, please do it for me, because I smoked pot and I will not pass."

- Plaintiff disputes that he became upset and that he stated that he was not going to have anyone go into the restroom with him.  Rather, Plaintiff claims he was informed that his first sample would be accepted and that he was free to go home.

> *See* Plaintiff Warren Brooks's Memorandum of Law in Opposition of Defendant AAA Cooper Transportation's Motion for Complete Summary Judgment [Doc. # 39-1] ("Response"), at 4-5.

[41]     TM Garza Decl. [Doc. # 31-2], ¶ 24.

have been documented in NOVA's files, and that there was no such documentation.[42]

*The Termination.–*   Based on his investigation of the incident, Terminal Manager Garza concluded that Plaintiff had refused to cooperate with NOVA during the February 1, 2008, drug test in violation of DOT drug testing regulations and ACT's Drug and Alcohol Policy.[43]  ACT's Drug and Alcohol Policy states that "[a]ny employee who refuses to be tested or otherwise cooperate with the testing process will be removed from the workforce and will be subject to immediate discharge."[44] Accordingly, Terminal Manager Garza concluded that Plaintiff's employment should be terminated for failing to cooperate with the drug test.

On February 6, 2008, Terminal Manager Garza informed Plaintiff in person that his employment with ACT was terminated due to his refusal to cooperate and submit a valid urine specimen during a random employee drug test in violation of ACT's

---

[42]     TM Garza Decl. [Doc. # 31-2], ¶ 24.

[43]     TM Garza Decl. [Docs. ## 31-2, 32-1], ¶¶ 25, 26.  Terminal Manager Garza testified that given his investigation of the incident, he did not believe that Plaintiff's claimed medical condition caused his refusal to provide an observed sample as directed by NOVA's staff.

[44]     AAA Cooper Transportation Drug and Alcohol Policy and Information, at 4, attached as Exh. A to TM Garza Dec. [Doc. # 31-2], at 8.   Plaintiff signed two Acknowledgment and Consent forms regarding this policy on June 16, 2000, and June 20, 2001 *See* AAA Cooper Transportation Company Drug and Alcohol Policy Acknowledgment and Consent, attached as Exh. F to TM Garza Decl. [Doc. # 32-1], at 33-34.

Drug and Alcohol Policy and as required by the DOT.[45]  ACT completed a Personnel Change Form reflecting ACT's termination of Plaintiff's employment for failure to follow DOT drug testing procedures.[46]

**COBRA notification.**–  On February 20, 2008, pursuant to standard ACT procedure, ACT prepared and sent a letter to Plaintiff explaining that he was eligible to continue his ACT health and dental insurance coverage under the provisions of the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. § 1161 *et seq.*[47]  This letter was never returned as undeliverable.[48]  Plaintiff claims he never received this letter, but testified he has no evidence to dispute that ACT mailed the letter as it claims.[49]

**CDL Information Request.**–  On July 7, 2009, ACT received a request from Casual Driver Leasing Services, LLC ("CDL"), for information regarding Plaintiff's former employment with ACT (the "CDL Form").  Donna Cochran ("Cochran"), a Payroll Assistant at ACT's corporate headquarters in Alabama processed this

---

[45]    TM Garza Decl. [Doc. # 32-1], ¶ 28.

[46]    TM Garza Decl. [Doc. # 32-1], ¶ 27; *see also* Personnel Change Form, attached as Exh. J to TM Garza Decl. [Doc. # 33-1], at 11.

[47]    Declaration of Courtney Deese Vickers [Doc. # 35-2] ("Vickers Decl."), ¶ 3.

[48]    *Id.*, ¶ 4.

[49]    Brooks Dep. [Doc. # 29-1], at 333-36, 339.  Plaintiff testified that it was his "belief" that they never mailed him the letter.  *See id.* at 336.

request.[50]  As requested, ACT verified Plaintiff's dates of employment and noted that Plaintiff operated a Tractor/Trailer for ACT.[51]  Pursuant to ACT's policy regarding employment references, ACT refused to provide other information regarding Plaintiff's employment.[52]

The CDL Form asked about Plaintiff's drug and alcohol testing record during his employment with ACT.[53]  The form asked: "Has this person refused (includes verified adulterated and substituted results) to take a required test for drugs and/or alcohol in the last three years?"  ACT's Safety Department representative checked the "Yes" answer for this question.[54]

ACT was required to provide CDL with this drug testing information pursuant to federal regulation, *see* 49 C.F.R. § 40.331.[55]  Moreover, ACT received the form after Plaintiff signed it reflecting his release of ACT from all liability to him in connection with the transmission of information to CDL in response to the

---

[50]    Declaration of Donna Cochran [Doc. # 35-3] ("Cochran Decl."), ¶¶ 1-3; *see also* Fax dated July 7, 2009, from Casual Driver Leasing Services to ACT ("CDL Form"), at 2-3, attached as Exh. B to Cochran Decl. [Doc. # 35-3], at 10-11.

[51]    Cochran Decl., ¶ 4.

[52]    *Id.*, ¶ 5.

[53]    *Id.*, ¶ 6.

[54]    *See* CDL Form, at 3.

[55]    *Id.*

information request.[56]  ACT provided no other information to CDL about Plaintiff.

Plaintiff filed this suit in Texas state court on February 5, 2010.  Defendant removed the case to this Court.  Plaintiffs' Amended Petition [Doc. # 17], which was drafted *pro se*,[57] appears to allege causes of action for wrongful termination, slander, as well as violations of the Privacy Act of 1974, the DOT drug testing program, and COBRA.[58]  Defendant filed the instant Motion for Summary Judgment, which has been fully briefed and is now ripe for decision.

## II.   SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union*

---

[56]   *Id.* at 2-3.

[57]   Plaintiff is now represented by counsel.  Plaintiff's counsel was admitted pro hac vice on December 3, 2010 [Doc. # 22].

[58]   In the "Damages" section of his amended complaint, Plaintiff references "intentional infliction of emotional distress" and "negligent infliction of emotional distress."  *See* Plaintiff's Amended Petition [Doc. # 17], at 3-4.  In his Response [Doc. # 39-1], Plaintiff specifically states that he is not seeking these claims.  Response, at 6.  As such, any such claims are deemed abandoned.

*v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002).  "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); *see Celotex Corp.*, 477 U.S. at 322-23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact."  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).  The moving party may meet its burden by pointing out "'the absence of evidence supporting the nonmoving party's case.'"  *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 913 (5th Cir. 1992)).

If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial.  *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (internal citation omitted).  "An issue is material if its resolution could affect the outcome of the action.  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations omitted).

In deciding whether a genuine and material fact issue has been created, the facts

and inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003) (internal citation omitted).  The Court may make no credibility determinations or weigh any evidence, and must disregard all evidence favorable to the moving party that the jury is not required to believe.  *See Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010) (citing *Reaves Brokerage Co.*, 336 F.3d at 412-413).  However, factual controversies are resolved in favor of the non-movant "only 'when both parties have submitted evidence of contradictory facts.'"  *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004) (quoting *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999)).

The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings.  *See King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994); *Johnston v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir. 1994).  Likewise, "conclusory statements, speculation, and unsubstantiated assertions cannot defeat a motion for summary judgment."  *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010); *see also Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).  "A party cannot defeat summary judgment with 'only a scintilla of evidence.'"  *Delta & Pine Land Co.*, 530 F.3d at 399 (quoting *Little*, 37 F.3d at 1075).

Rather, a party must support any assertion that a fact cannot be or is genuinely

disputed by "(a) citing to particular parts of materials in the record . . . ; or (b) showing that the materials cited do not establish the absence or present of a genuine dispute, or that an adverse party cannot produce admissible evidence to support that fact."   FED. R. CIV. P. 56(c)(1).   Affidavits cannot defeat summary judgment unless they contain competent and otherwise admissible evidence.   FED. R. CIV. P. 56(c)(4).   A party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary.   *See In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000).

Further, "the court need consider only the cited materials, but it may consider other materials in the record."   FED. R. CIV. P. 56(c)(3).   "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."   *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003).   "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."   *Id.*

In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts.   *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).   Rather, "if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the court may, *inter alia,* "(2) consider the fact undisputed

for purposes of the motion; [or] (3) grant summary judgment if the motion  and

supporting materials – including the facts considered undisputed – show that the

movant is entitled to it . . . ." FED. R. CIV. P. 56(e).

## III.   DISCUSSION

Plaintiff's Amended Petition [Doc. # 17], appears to allege causes of action for

wrongful termination, slander, as well as violations of the Privacy Act of 1974, the

DOT drug testing program, and COBRA.[59]  Defendant argues that Plaintiff waived all

claims except his wrongful termination claim in his deposition.[60]  In responding to

Defendant's Motion for Summary Judgment, however, Plaintiff reiterates that he is

seeking damages against ACT for "wrongful termination, violation of the Privacy Act

of 1974, Slander, Violations of the DOT Drug Testing Program, and the Consolidated

Omnibus Budget Reconciliation Act (COBRA)."[61]  Plaintiff also asserts that he has

not withdrawn any claims because he has not submitted an amended complaint

---

[59]     In the "Damages" section of his amended complaint, Plaintiff references "intentional
infliction of emotional distress" and "negligent infliction of emotional distress."  *See*
Plaintiff's Amended Petition [Doc. # 17], at 3-4.   In his Response, Plaintiff
specifically states that he is not seeking these claims.  Response [Doc. # 39-1], at 6.
As such, any such claims are deemed abandoned.

[60]     *See* Defendant AAA Cooper Transportation's Memorandum of Law in Support of its
Motion for Complete Summary Judgment [Doc. # 26] ("Defendant's Memorandum
of Law"), at 17 (quoting Brooks Dep. [Doc. # 27-1], at 102-106).

[61]     Response, at 6.

withdrawing claims nor has he sought leave of this Court to withdraw any claims.[62]

Under these circumstances, the Court declines to hold that Plaintiff abandoned claims

through his deposition.  Accordingly, the Court will address each of Plaintiff's claims

on the merits.

### A.    <u>Wrongful Termination</u>

"Under Texas law, employment is 'at will, terminable at any time by either

party, with or without cause, absent an express agreement to the contrary.'" *Amigo

Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 481 (5th Cir. 2008) (quoting

*Fed. Express Corp. v. Dutschmann*, 846 S.W.2d 282, 283 (Tex. 1993)); *see also

County of Dallas v. Wiland*, 216 S.W.3d 344, 347 & n.5 (Tex. 2007) (collecting

cases).  Plaintiff concedes that no "actual agreement" exists between Plaintiff and

ACT regarding Plaintiff's employment.[63]  Instead, Plaintiff argues, without supporting

legal authority, that his signing of numerous drug testing consent forms established

---

[62]    *Id.*

[63]    *See* Response at 8.  Indeed, at least two ACT documents expressly provide that
employment is at-will.  *See* Plaintiff's Application for Employment, at 4, Fourth
Evidentiary Appendix [Doc. # 30-1], at 6 ("I understand that, if hire . . . my
employment is for an indefinite duration without any consideration before or after hire
other than my services to [ACT] and is terminable at will of [ACT] or myself for any
or no reason at any time without recourse.); AAA Cooper Transportation
Commitment to Teamwork:  Employee Handbook Policies and Procedures, at 4,
Fourth Evidentiary Appendix [Doc. # 30-1], at 11 ("Your employment is terminable
at the will of ACT or yourself for any reason not prohibited by law at any time.").
Plaintiff's signature on the Application for Employment appears directly under the
cited provision, acknowledging that he had read and understood the statement before
signing.

an implied-in-law contract between Plaintiff and ACT that "if Mr. Brooks cooperated with drug testing procedures and Mr. Brooks tested negative for any of the tested substances, . . . then Mr. Brooks would not be subject to discharge with respect to drug testing."[64]

Plaintiff's argument that he had an employment contract is without merit. Texas law is clear that absent an express agreement to the contrary, employment is presumed to be at-will. *See Midland Judicial Dist. Cmty. Supervision & Corr. Dep't v. Jones*, 92 S.W.3d 486, 487 (Tex. 2002) (citing *Montgomery Cnty. Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998)).  "In order for an employee to avoid the effects of the employee-at-will doctrine, he must show that the employer unequivocally expressed its intent to be bound not to terminate the employment except under clearly specified circumstances or conditions." *Farone v. Bag'n Baggage, Ltd.*, 165 S.W.3d 795, 799 (Tex. App.–Eastland, 2005, no pet.) (citing *Midland*, 92 S.W.3d at 488).  The fact that Plaintiff signed forms consenting to drug testing is insufficient to create or prove an express employment agreement.[65]  Plaintiff provides no legal authority suggesting that the Court can imply an employment contract under the circumstances presented here or that the implied-in-law contract doctrine can overcome the at-will employment presumption.

---

[64]     Response, at 7.

[65]     Plaintiff does not dispute this proposition.

More significantly, Plaintiff's "wrongful termination" claim appears to rely on the Texas doctrine of "wrongful termination in violation of public policy." *See Sabine Pilot Srvc., Inc. v. Hauck*, 687 S.W.2d 733, 735 (Tex. 1985).  Under Texas law, a claim for wrongful termination in violation of public policy exists only if the employee is discharged "for the sole reason that [he] refused to perform an illegal act." *See Sabine Pilot Srvc., Inc.*, 687 S.W.2d at 735.  Plaintiff has neither alleged nor presented evidence that his employment was terminated because he refused to perform an illegal act.  Defendant is entitled to summary judgment on Plaintiff's wrongful termination claim.

### B. COBRA Claim

The Consolidated Omnibus Budget Reconciliation Act ("COBRA") requires sponsors of group health plans to provide plan participants who lose coverage because of a "qualifying event" with the opportunity to choose to continue health care coverage on an individual basis.  *See* 29 U.S.C. §§ 1162, 1163.  "Qualifying events" include the termination of a covered employee's employment.  *See id.* § 1163(2).  Significantly for the case at bar, when a "qualifying event" occurs, the plan sponsor must provide written notice to the plan participant within 14 days of the date the plan was notified of the qualifying event.  *See id.* § 1166(a)(1), (a)(2), (a)(4), and (c); *see also Geissal v. Moore Medical Corp.*, 524 U.S. 74, 79–80 (1998); *Degruise v. Sprint Corp.*, 279 F.3d 333, 336 (5th Cir. 2002).

It is undisputed that Plaintiff's employment was terminated on February 6, 2008.  Further, there is no dispute that Plaintiff's separation from ACT was a qualifying event or that Plaintiff was entitled to receive COBRA benefits if he elected to receive them.  ACT appears to concede that it was obligated to provide Brooks with detailed written notice of the availability of COBRA benefits within 14 days of the separation, that is by February 20, 2008, at the latest.[66]

Defendant argues that it met its obligation to provide notice under COBRA because on or about February 20, 2008, Courtney Deese Vickers ("Vickers"), a Benefits Specialist at ACT's corporate headquarters, placed in the mail to Brooks a letter explaining that he was eligible to continue his health and dental insurance coverage under COBRA (the "COBRA Notice Letter").[67]  Vickers declares that she "personally placed this letter in [ACT's] outgoing mail," and attaches a signed copy of the COBRA Notice Letter, dated February 20, 2008, to her declaration.[68]  Plaintiff makes no argument that the COBRA Notice Letter was in any way deficient for notice

---

[66]   An employer has a duty to report most qualifying events, including the termination of employment, to its group health plan administrator within 30 days of the qualifying event.  The plan administrator must then inform the qualified beneficiary of his rights within 14 days of being notified of the qualifying event by the employer.  29 U.S.C. § 1166(c).  When an employer is also the administrator of the health plan, the employer must give detailed written notice of the availability of COBRA benefits within 44 days after the date of the qualifying event, which includes termination other than for gross misconduct.  *See* 29 C.F.R. § 2590.606-4(b).

[67]   *See* Vickers Decl., ¶¶ 1, 3.

[68]   *See id.*, ¶ 3, and Exh. B thereto.

under COBRA.  Plaintiff argues simply that Defendant has not presented sufficient evidence that the COBRA Notice Letter was actually mailed to him.[69]

Defendant relies on *Degruise v. Sprint Corp.*, 279 F.3d 333, 336-37 (5th Cir. 2002), which stated that "employers are required to operate in good faith compliance with a reasonable interpretation of what adequate notice entails."  279 F.3d 333, 336 (5th Cir. 2002) (internal quotation marks omitted).  The Fifth Circuit further explained that employers were *not* "required to ensure that plan participant actually received notice."  Rather, employers are merely obligated "to use means reasonably calculated to reach plan participants."  *Id.*

Vickers's evidence that she placed the COBRA Notice Letter in ACT's "outgoing mail" on February 20, 2008, and that the letter was not ever returned as undeliverable,[70] is sufficient to meet Defendant's summary judgment burden.  Plaintiff has provided no contrary evidence.  He has no evidence suggesting that the COBRA Notice Letter was processed incorrectly, nor showing any deficiency in Defendant's mailing system.[71]  Plaintiff has not raised a genuine issue of material fact.  As such,

---

[69]     *See* Response, at 9.

[70]     Vickers Decl., ¶¶ 3, 4

[71]     In his deposition, Plaintiff testified that the letter was addressed to him at his correct address; it was possible the letter could have been lost in the mail; and he had no evidence to dispute that ACT had mailed the COBRA Notice Letter to him as it says it did.  Brooks Dep. [Doc. # 29-1], at 328-38, 339.  Plaintiff testified, however, that
(continued...)

Defendant is entitled to summary judgment on Plaintiff's COBRA claim.

### C.    <u>Slander Claim</u>

To maintain a defamation cause of action under Texas law, a plaintiff must prove that the defendant: "(1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with . . . negligence, if the plaintiff was a private individual, regarding the truth of the statement." *WFAA-TV, Inc. v. McLemore*, 978 S.W.3d 568, 571 (Tex. 1998); *accord Green v. CBS Inc.*, 286 F.3d 281, 283 (5th Cir. 2002) (citing *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989)). "Slander is a defamatory statement that is orally communicated or published to a third person without legal excuse." *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.3d 640, 646 (Tex. 1995).  Plaintiff argues that ACT committed slander when it filled out the CDL Form, indicating that Plaintiff had refused to take a required drug test within the last three years.  The Court notes that because the information about which Plaintiff complains is in writing (the CDL Form), technically Plaintiff's claim is for libel, *see* Tex. Civ. Prac. & Rem. Code Ann. § 73.001 (Vernon 2005) ("A libel is a defamation expressed in written or other graphic form . . . ."), not slander.  The Court does not find the error in legal terminology material.

---

[71](...continued)

  it was his "belief" that ACT had not mailed him the letter.  *Id.* at 336.  Finally, Plaintiff testified that he had no evidence to support his COBRA claim other than the fact that he never received the COBRA Notice Letter.  *Id.* at 339-40.

*Consent.*–   ACT is entitled to summary judgment on Plaintiff's defamation claim because Plaintiff consented to the publication of the information.  Under Texas law, "it is clear that one can consent to defamation, and that consent creates an absolute bar to a defamation suit." *Smith v. Holley,* 827 S.W.2d 433, 439-40 (Tex. App.–San Antonio, 1992, writ denied); *see also Lyle v. Waddle*, 188 S.W. 2d 770, 772 (Tex. 1945); *Oliphint v. Richards*, 167 S.W.3d 513, 516 (Tex. App.–Houston [14 Dist.], 2005, pet. denied); *Rouch v. Continental Airlines, Inc.*, 70 S.W.3d 170, 172-73 (Tex. App.–San Antonio, 2001, pet. denied).  The scope of a plaintiff's consent, however, "does not exceed what is reasonable in light of the language or circumstances that created it." *Smith*, 827 S.W.2d at 439.  "[C]onsent does not immunize defamations that the plaintiff had no reason to anticipate." *Smith,* 827 S.W.2d at 440 (discussing *Frank B. Hall & Co. v. Buck*, 678 S.W.2d 612, 617-18 (Tex. App.–Houston [14th Dist.] 1984, writ ref'd n.r.e.), and *Ramos v. Henry C. Beck Co.*, 711 S.W.2d 331, 336 (Tex. App.–Dallas 1986, no writ)).

Here, Plaintiff signed the CDL Form before it was sent to ACT to be completed. In doing so, he released ACT from "any and all liability for damages of whatever kind or nature which may at any time result to me on account of compliance or attempts to comply with this request for information and authorization."[72]  *Smith* addressed a

---

[72]      *See* CDL Form, at 2, attached as Exh. B to Cochran Decl. [Doc. # 35-3], at 10.

release with wording very similar to the release in issue here.[73]  This release "is worded broadly enough to reach all kinds of defamatory remarks" and "releases every kind of lawsuit imaginable."  827 S.W.2d at 439-40.  The release "simply does not permit the interpretation that the signer reserved the right to sue persons who honor it and give information fairly related to the matters covered."  *Id.* at 440.

Plaintiff concedes that he signed this release and argues, without legal authority, that "ACT is required to provide truthful statements to prospective employers."[74]  Plaintiff's argument misstates controlling Texas law.  A plaintiff's consent bars an action for defamation on matters he had reason to anticipate.  *See Lyle*, 188 S.W. 2d at 772; *Oliphint*, 167 S.W.3d at 516; *Rouch*, 70 S.W.3d at 172-73*; Smith,* 827 S.W.2d at 439-40; *Ramos*, 711 S.W.2d at 336; *Buck*, 678 S.W.2d at 617-18.  Plaintiff had reason to anticipate that ACT would relay information to CDL about ACT's view that Plaintiff failed to comply with applicable drug testing procedures.  Indeed, ACT had

---

[73]    The release in *Smith* provided "I hereby release any individual, including record custodians, from any and all liability for damages of whatever kind or nature which may at any time result to me on account of compliance, or any attempts to comply, with this authorization. *See Smith v. Holley*, 827 S.W.2d at 435.  The CDL Form contained the following release: "I hereby release any individual or entity from any and all liability for damages of whatever kind or nature which may at any time result to me on account of compliance or attempts to comply with this request for information and authorization.  *See* CDL Form, at 2, attached as Exh. B to Cochran Decl. [Doc. # 35-3], at 10.  Plaintiff's signature appears directly under this release. *Id.*

[74]    *See* Response, at 10.

told Plaintiff that his employment was terminated for this reason.       Furthermore, the evidence of record does not support Plaintiff's contention that ACT misrepresented the truth in filling out the CDL Form.  Rather, the record reflects that Donna Cochran, a Payroll Assistant at ACT's corporate headquarters in Alabama, filled out and signed the CDL Form.  She testifies that she asked ACT's Safety Department to mark the appropriate responses regarding Plaintiff's drug and alcohol testing record.   The form asked: "Has this person refused (includes verified adulterated and substituted results) to take a required test for drugs and/or alcohol in the last three years?"  In response, according to Cochran's uncontradicted testimony, ACT's Safety Department representative checked "Yes" for that question,[75] which answer accurately reflected Plaintiff's Personnel Change Form showing that ACT terminated Plaintiff's employment for failure to follow drug testing procedures.[76] There is no evidence that Cochran or anyone in ACT's Safety Department was aware of the series of events leading to termination of Plaintiff's employment or of Plaintiff's disagreement with ACT's conclusions.  These employees accurately relayed the information reflected on Plaintiff's Personnel Change Form.

ACT's response on the CDL form was within the scope of the release executed

---

[75]      *See* CDL Form, at 3, attached as Exh. B to Cochran Decl. [Doc. # 35-3], at 11.

[76]      Cochran Decl., ¶ 2; *see also* Personnel Change Form, attached as Exh. A to Cochran Decl. [Doc. # 35-3], at 7.

by Plaintiff.   Plaintiff's consent therefore bars his action for defamation and Defendant is entitled to summary judgment.

   ***Qualified Privilege.***–   Defendant is also entitled to summary judgment on Plaintiff's defamation claim because under Texas law, a qualified privilege protects a former employer's statements about a former employee to a prospective employer. *See, e.g.*, *Wheeler v. Miller*, 168 F.3d 241, 253 (5th Cir. 1999); *Burch v. Coca-Cola Co.*, 119 F.3d 305, 323-26 (5th Cir. 1997); *Pioneer Concrete of Tex., Inc. v. Allen*, 858 S.W.2d 47, 49 (Tex. App.–Houston 1993, writ denied); *Smith v. Holley*, 827 S.W.2d 433, 436 (Tex. App.–San Antonio 1992, writ denied).   Here, ACT's statement to CDL falls within this qualified privilege.   Although a showing of actual malice will defeat this privilege, *see Wheeler*, 168 F.3d at 253; *Burch*, 119 F.3d 323, there is no showing of actual malice under the circumstances presented.[77]

   Plaintiff does not dispute that ACT had a qualified privilege to report to CDL.

---

[77]   Under federal court summary judgment standards, it is the plaintiff who must adduce proof of malice in order to avoid entry of summary judgment against him, since state law requires the plaintiff to demonstrate such malice at trial.  *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 313-14 (5th Cir. 1995) (citing *Celotex* to conclude that the burden of raising a genuine question of malice rests upon the plaintiff).   Summary judgment motions in Texas state courts, however, may use a slightly different procedure:  "Once the defendant has produced evidence negating actual malice as a matter of law, the burden shifts to the plaintiff to present controverting proof raising a genuine issue of material fact."   *Huckabee v. Time Warner Entm't Co. L.P.*, 19 S.W.3d 413, 420 (Tex. 2000); *see generally Randall's Food Mkts.*, 891 S.W.2d at 646; *Crouch v. Trinque*, 262 S.W.3d 417, 425 (Tex. App.–Eastland, 2008, no pet.).   The distinction of who has the burden of proof on malice does not affect the outcome of this case.

Plaintiff instead argues that, "[w]hile ACT may argue they have a qualified privilege to report to CDL, ACT is required to report the truth."[78]  Plaintiff's argument is unavailing.  A defamation plaintiff must prove  actual malice, not merely falsity, in order to defeat this employment-related qualified privilege.

For defamation claims, actual malice refers to the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true.  *Wheeler*, 168 F.3d at 253; *Duffy*, 44 F.3d at 313 (citing *Carr*, 776 S.W.2d at 571).  "Reckless disregard is defined as a high degree of awareness of probable falsity, for proof of which the plaintiff must present sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.  An error in judgment is not enough." *Duffy*, 44 F.3d at 313 (quoting *Carr*, 776 S.W.2d at 571 (internal quotation marks omitted)).  "Negligence, lack of investigation, or failure to act as a reasonably prudent person are insufficient to show actual malice."  *Id.* at 313 (internal citation omitted).

To establish actual malice, Plaintiff argues that "there is documentation that demonstrates Mr. Brooks' consent to take the drug test, and again, documentation that shows that Mr. Brooks' test results were negative."[79]  Plaintiff relies on a February 5,

---

[78]	*See* Response, at 10.

[79]	*See* Response, at 9.

2008, drug test report showing a negative test result for drugs.[80]   Even if this document were sufficient under the circumstances in this case to establish Plaintiff complied with the drug testing procedures, which is not the case, there is no evidence that either the ACT Safety Department representative, who filled out the drug testing portion of the CDL Form, or Cochran (who processed the rest of the form) was aware of the negative test result report and thus knowingly or recklessly made a false statement.  Rather, the CDL response correctly tracked the information on Plaintiff's Personnel Change Form that Plaintiff had been terminated for "Failure to Follow D.O.T. Drug Testing Procedures."[81]  This response tracked the information provided by NOVA to ACT and the conclusions of Terminal Manager Garza.  Accordingly, the record does not support a finding that Defendant ACT through Cochran or ACT's Safety Department, the only ACT representatives involved in completing the CDL Form, knowingly falsely reported or "entertained serious doubts" that Plaintiff was discharged for failing to follow drug testing procedures.  Thus, Plaintiff did not present evidence to raise a genuine fact issue that Defendant acted with actual malice against Plaintiff in responding "Yes" to the question "Has this person refused (includes verified adulterated and substituted results) to take a required test for drugs and/or alcohol in the last three years?".  ACT's response on the CDL Form is

---

[80]     *See* Results of DOT Controlled Substance Test [Doc. # 39-2], at 2-3.

[81]      Personnel Change Form, attached as Exh. A to Cochran Decl. [Doc. # 35-3], at 7.

protected by the qualified privilege, and ACT is entitled to summary judgment on Plaintiff's defamation claims.

### D.   <u>Privacy Act of 1974</u>

Plaintiff asserts a claim for violation of the Privacy Act of 1974, 5 U.S.C. § 552a.  ACT argues that the Privacy Act of 1974 is applicable to federal agencies only and does not regulate the conduct of private companies.  *See* 5 U.S.C. § 552a(a)(5); 552a(g).  Plaintiff concedes this point and the Court agrees. Accordingly, Defendant is entitled to summary judgment on the Privacy Act claim.

### E.   <u>Violations of DOT Drug Testing Program</u>

In his Complaint, Plaintiff asserts a cause of action against ACT for "violating the Department of Transportation Procedures For Transportation Work Place Drug Testing Programs. (DOT) Title 49. Transportation."[82]  He also asserts that ACT is vicariously liable for NOVA's failure to follow these procedures."[83]  The Sixth Circuit and the Texas Supreme Court have concluded that Congress has not given employees a private right of action under the DOT drug testing regulations.  *See, e.g.*, *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 308 (6th Cir. 2000); *Mission Petroleum*

---

[82]     *See* Plaintiff's Amended Petition [Doc. # 17], ¶ 17.

[83]     *Id.*, ¶ 18.

*Carriers, Inc. v. Solomon*, 106 S.W.3d 705, 713 (Tex. 2003).[84]  "[C]ourts have similarly refused to impose a common-law tort duty requiring an employer's agent to comply with DOT protocol when the agent collects samples for drug testing." *Solomon*, 106 S.W.3d at 712; *see also Graham v. Contract Transp., Inc.*, 220 F.3d 910, 912 (8th Cir. 2000) (employee's claim that employer's drug test administered by outside testing center was not administered in compliance with DOT regulations was at most a negligent-discharge claim not actionable under Iowa law).  Plaintiff has provided no contrary legal authority.  Indeed Plaintiff does not appear to even address this claim in his Response.  Defendant is entitled to summary judgment on this claim.

## IV.   CONCLUSION AND ORDER

The Court concludes that Plaintiff has not raised a genuine material fact issue on any of his claims in response to Defendant's summary judgment Motion. Accordingly, it is hereby

**ORDERED** that Defendant's Motion for Summary Judgment [Doc. # 26] is **GRANTED**.

The Court will issue a separate final judgment dismissing this case with

---

[84]   At least three courts of appeals, including the Fifth Circuit, have found no private cause of action under other federal drug testing regulations. *Drake v. Delta Air Lines, Inc.*, 147 F.3d 169, 170-71 (2d Cir. 1998) (finding no implied right of action for employees under Federal Aviation Administration drug testing regulations); *Schmeling v. NORDAM*, 97 F.3d 1336, 1343-44 (10th Cir. 1996) (same); *Abate v. S. Pac. Transp. Co.*, 928 F.2d 167, 169-70 (5th Cir. 1991) (finding no private right of action under the Federal Railroad Safety Act's drug testing regulations).

prejudice.

SIGNED at Houston, Texas, this **18th** day of **March, 2011**.

Nancy F. Atlas
United States District Judge